**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF FLORIDA**
**GAINESVILLE DIVISION**

In re:

DAVIS HERITAGE GP HOLDINGS, LLC,                    CASE NO.:  10-10515-LMK

                                                    CHAPTER:  11

                    Debtor.

_____/

## ORDER GRANTING INERVEST'S MOTION TO DISMISS CASE

THIS MATTER came before the Court for final evidentiary hearing on Wednesday, December 8, 2010, in Tallahassee, Florida.  Appearing at the hearing were R. Scott Shuker and Justin Luna, representing Debtor Davis Heritage GP Holdings, LLC ("Debtor"); Karen Specie and Seldon J. Childers, representing Inervest Capital, Ltd.; Roberta Colton, representing Wells Fargo Bank; and J. Ellsworth Summers, Jr., representing SunTrust Bank.   At the hearing the Court took testimony, received evidence, and heard argument of counsel for the Debtor, Movant and creditor Inervest, Capital, Ltd.. ("Inervest"), creditor Wells Fargo Bank, N.A. f/k/a Wachovia Bank, N.A. ("Wells Fargo"), and creditor SunTrust Bank ("SunTrust").   Having received and carefully considered the testimony, the evidence presented, the record and the demeanor of the witnesses, and being fully advised, the Court enters the following findings of fact and conclusions of law.

### I.    Procedural History

On September 26, 2010, the Debtor filed its voluntary Chapter 11 petition (Doc. 1).  This Court entered its standard order authorizing the Debtor to continue doing business as a Debtor-in-Possession on September 28, 2010 (Doc. 7).  The Debtor filed its Schedules and Statement of Financial Affairs on October 11, 2010 (Doc. 18) and its Amended Schedule B and Amended Matrix on November 2, 2010 (Doc.  55).  Shortly thereafter, Inervest filed an Emergency Motion

for Relief from Automatic Stay, or in the Alternative for Adequate Protection (the "stay relief motion") and its Statement of Need for Emergency Hearing on October 21, 2010 (Docs. 23, 25). The Court scheduled, and held, a telephonic hearing on the stay relief motion on October 25, 2010.  Inervest also filed a Motion to Dismiss Chapter 11 Case or, in the Alternative, for Appointment of Examiner on October 28, 2010 (Doc. 39) and a Motion for Abstention Under § 305 on October 31, 2010 (Doc. 45).  On November 2, 2010, the Court entered an order granting adequate protection to Inervest pending a final determination on the stay relief motion (Doc. 54), and scheduled the final evidentiary hearing on the stay relief motion for December 8, 2010.  The Court subsequently set for hearing all pending motions on the same date and time as the stay relief motion.

Before the December 8 hearing, the Debtor filed its Emergency Motion to Sell Assets Free and Clear of All Liens, Claims and Encumbrances and Certificate of Necessity for Emergency Hearing (Doc. 88)  (the "sale motion") on December 3, 2010,  and the Court scheduled the sale motion for hearing on December 8, 2010.

On December 7, 2010, the day prior to the hearing on all matters, the Debtor filed a Chapter 11 Plan (the "Plan") and Disclosure Statement (Docs. 111, 112).


## II.    Facts

The facts in this matter are not in dispute.  Davis Heritage GP Holdings, LLC ("Debtor") is an LLC formed in 2002 to "hold, develop, and sell condominium development properties in Mississippi and Louisiana" (Debtor's Case Management Summary, Doc. 32).  The Debtor is jointly owned by the Davis family: brothers Stefan Davis, Damon Davis, and Trevor Davis, and by Earth Art, Inc., the corporation of the mother, Norita Davis (Inervest Ex. 2, Statement of Financial Affairs ("SOFA") #21).    The testimony and DIP reports show that the Debtor has no em-

ployees as well as no income or expenses (Docs. 30, 83) (Inervest Ex. 4, Tr. 77). Its only asset consists of membership interests in certain LLC subsidiaries (Sch. B, SOFA, Case Management Summary, Doc. 32); *see also* Debtor's Emergency Motion for an Order approving Sale of Assets Free and Clear of all Liens, Claims and Encumbrances (Doc. 88) (Inervest Ex. 3; Tr. 77). The Debtor also owns a parcel of vacant real property in Biloxi, Mississippi that has no value to the Estate and is subject to a mortgage held by Wells Fargo.

The Debtor owns 100% membership interests in seven (7) single-member LLC's and an undivided 0.0095% interests in an eighth LLC (together, the "Middle Tier LLCs"), as follows:

1.  Davis-Heritage-Antiqua, LLC – 100%;

2.  Davis-Heritage-Baleen, LLC – 100%;

3.  Davis-Heritage-Beau View, LLC – 100%;

4.  Davis-Heritage-Biscayne Bay, LLC (a/k/a Davis Heritage-Biscayne, LLC)– 100%;

5.  Davis-Heritage-Navarre, LLC – 100%;

6.  Davis-Heritage-Hendricks Isle, LLC – 100%;

7.  Davis-Heritage-Diplomat, LLC – 100%; and

8.  Davis-Heritage-Stratford Mill, LLC (General Partner) –0.0095% ("Stratford Mill").

The Middle Tier LLCs have no employees, no income, and no expenses. (Tr. 30-31; 77; 148-49). Each Middle Tier LLC owns nothing except for membership in one similarly named single member LLC (collectively, the "Lower Tier LLCs") (*see* Doc. 112), as follows:

1.  Antiqua at NMB, LLC;

2.  Baleen of Destin, LLC;

3.  Beau View of Biloxi, LLC;

    4.   Biscayne Bay of Miami, LLC;

    5.   Diamond of Navarre, LLC;

    6.   The Club at Hendricks Isle, LLC;

    7.   The Diplomat at Jackson, LLC (a/k/a Diplomat at Jackson, LLC); and

    8.   Stratford Mill of St. John's County.

The Debtor was originally a developer, and at that time owned other real property, including real property on which now stands a 21-story luxury condominium tower named, "Beau View of Biloxi." (Inervest Ex. 5; Tr. 55-58). The Middle and Lower Tier LLCs were formed in 2006, and the Debtor's principal, Stefan Davis, offered no explanation for why the Debtor decided at that time to use this three-tier LLC structure, where all the real assets are owned by the third of the three tiers. None of the Middle Tier or Lower Tier LLCs have filed bankruptcy petitions.

Notwithstanding the three-tier corporate structure, in every significant way, the Debtor has managed the various entities (the Debtor, the Middle Tier LLCs, and the Lower Tier LLCs) as a single enterprise. Until shortly before filing this instant Case, the expenses and income of the enterprise were processed through the Debtor's bank account. In fact, none of the Lower Tier LLCs held bank accounts in their names until after meeting with the Debtor's bankruptcy counsel. (Inervest Ex. 12, pp. 33-34; Tr. 77, 80-82). From at least January 2007 through August 2010, the Debtor's bank accounts contained several millions of dollars, at one time exceeding $22 million. The Debtor's principals have used the Debtor's accounts freely, to receive and disburse money to and from whomever the principals chose at any given time. (Inervest Ex. 34). Despite this fact, the Debtor only disclosed one bank account in its Schedule B and did not disclose, but rather affirmatively denied, making any transfers to insiders within one year prepetition. (Inervest Ex. 2, SOFA, 3(c)).

Since at least 2004 and continuing until just prior to filing its Chapter 11 petition, the Debtor had managed all operations as though it, and the subsidiary LLCs, were a single enterprise. The Debtor prepared jointly administered tax returns for itself and the Middle and Lower Tier LLCs as well as submitted consolidated financial statements to its creditors. (Inervest Ex. 34; Tr. 71-72, 78-79, 87-89).

The real property that the Lower Tier LLCs either own or on which they hold leasehold interests are:

1. Antiqua at NMB owns 17 acres in North Miami Beach, with an approximate fair market value of $5 million and no mortgages encumbering the property. The Debtor purchased this property in 2003 or 2004 for approximately $6.2 million (Tr. 94-95). Real property taxes are at least two (2) years delinquent on this property (Tr. 74).

2. Baleen at Destin owns a .5 acre vacant lot on Destin Harbor which has been valued at $1.5 million (Tr. 39, 95-96, 137).

3. Beau View of Biloxi owns 39 luxury condominium units in Biloxi, MS (Tr. 77)

4. Biscayne Bay of Miami owns a vacant one-acre parcel on Biscayne Bay in Miami, FL intended for construction of a 27-unit condominium building. The purchase price was $6 million, and the existing SunTrust mortgage encumbering this property is approximately $2.5 million. (Tr. 67-68).

5. Diamond of Navarre owns a .8 acre vacant lot on the beach at Navarre Beach, Pensacola, FL (Tr. 85-86, 95). The original purchase price for this property was $2.8 million and there are no outstanding mortgages on this property. This property is also delinquent on paying taxes. (Tr. 74).

6.  The Club of Hendricks Isle is a 14-unit condo development located in the Las Olas section of Ft. Lauderdale, FL.  All of the units have been sold and according to Stefan Davis, this entity no longer owns any assets.  (Tr. 85).

7.  The Diplomat of Jackson owns 25 condominium units in Jackson, MS and the taxes on this property are two (2) years in arrears.  (Tr. 73, 85, 94).

8.  Stratford Mill of St. John's County owns a 241-unit "Class A" rental property located at 110 Stratford Mill Blvd., Saint Augustine, FL.  (Tr. 50, 79).  The apartments range from 1-4 bedroom units and rent for an advertised amount of anywhere between $850-$1,225 per month.  The mortgage on this property has a balance of $18 million and the taxes are current.  (Tr. 74, 93).

The Debtor has never disclosed the properties owned by the Lower Tier LLCs in its Schedules or any other papers it has filed with the Court, nor has it reported any of those entities' income or expenses.  (Ex. 2, 3).   This non-disclosure notwithstanding, the Debtor's Plan is based entirely upon the liquidation of some of those very properties (Doc. 111).  The Debtor, the Middle Tier LLCs, and the Lower Tier LLCs are all controlled by the same principals – Stefan Davis, his mother Norita Davis, and their various other affiliates.  The Debtor operates no business and has no value absent the Lower Tier LLCs and their respective pieces of real property.  The Debtor scheduled the value of its ownership interests in the Middle Tier LLCs at $718,572.55 (Inervest Ex. 2, Sch. B).  The unrefuted evidence is that the value of the real property owned by the Lower Tier LLCs is far in excess of that sum, even based solely on the purchase prices for those properties (Tr. 16, 66, 83-87, 93-95).

The Debtor also scheduled notes payable from insiders totaling $1,764,477.00.  (Inervest Ex. 2, Doc. 18).  Stefan Davis testified that the Debtor has made no effort to make demand for payment on account of those notes but that these notes would be offset by the claims of the insiders

6

against the Debtor.  (Tr. 118-19).  At the same time, the Plan is silent with respect to collection on these notes. (*See* doc. 111).

### III.    Inervest and the Debtor

In 2004, Inervest, f/k/a Coastal Land Development, Inc., owned a contiguous parcel of development real estate in Biloxi, MS that consisted of four development lots.  At that time, Inervest was having financial difficulties and the property was in foreclosure.  (Tr. 98-99).  The Debtor and Inervest executed a contract in 2004 for the Debtor to purchase Inervest's Biloxi real property.  The total purchase price was $20 million (Tr. 55). Inervest financed the purchase by taking back a purchase-money mortgage securing two notes totaling $5 million.  The Debtor financed the remainder of its purchase by borrowing $13.5 million from Wells Fargo, f/k/a Wachovia, secured by another purchase-money mortgage (the "Acquisition Loan").  (Tr. 55).  Wells Fargo's mortgage was secured by the entire four-lot parcel, while Inervest's mortgage was secured by lots two, three, and four only.  Inervest (Ex. 15, 36).  In order to facilitate the sale of the four lots to the Debtor and avoid losing the property at foreclosure, Inervest agreed to subordinate its mortgages to the Wells Fargo Acquisition Loan, and signed a Subordination Agreement with Wells Fargo. (Tr.  123; Wells Fargo Ex. 1).  At closing, Inervest received $1 million in cash and a purchase-money mortgage totaling $5 million; the balance of the purchase price (some $12 million) was paid to creditors and lienholders of Inervest.  (Tr. 99-101).

In April of 2006, the Debtor's principals formed the Lower Tier LLCs, including Beau View of Biloxi, LLC ("Beau View").   By providing Wells Fargo with combined "enterprise" tax returns and financial statements, Beau View obtained a Construction loan of up to $45 million with which to construct the 21-story luxury condominium "Tower 1" on the property purchased from Inervest (the "Construction Loan").  Beau View was the obligor on the Construction Loan, and the Debtor, along with Beau View and other Debtor affiliates and insiders, were the guarantors on that loan (Tr. 55-

56; 58; 79).  Before closing on the Construction Loan, the Debtor transferred Lot One of the four to Beau View, and directed Beau View to give Wells Fargo a second mortgage on Lot One to secure the obligation.  (Inervest Ex. 21).

Beau View ultimately borrowed approximately $42 million from Wells Fargo on the Construction Loan and completed construction on Tower 1.  (Tr. 83).   Since completion of Tower 1, Beau View has been selling its condominium units and has used those proceeds to pay down the Wells Fargo Construction Loan to a balance of $8.2 million.  (Tr. 83).  As of the petition date, Beau View still owned 39 condo units in Tower 1.  (Inervest Ex. 12).

From the time that it bought the Beau View property from Inervest in 2004 through the petition date, the Debtor has paid Inervest only four interest payments, each in the amount of $140,000.  (Tr. 66).   In addition, the Debtor paid Inervest some $45,000 from the sale of a condo unit at "The Diplomat."

The Inervest notes matured in 2006 and 2007, respectively.  When the Debtor did not pay the Inervest notes as they came due, Inervest sued the Debtor on the notes.  On March 18, 2010, a Mississippi state court awarded Inervest a judgment against the Debtor in the amount of $8,036,519.38 for principal, interest, attorneys' fees and costs (the "Final Judgment").  (Inervest Ex. 35).  Inervest then domesticated the Final Judgment in Florida, recorded a judgment lien certificate with the Florida Secretary of State, and on July 15, 2010, caused the Alachua County Sheriff to levy on the Debtor's membership interests in the Middle Tier LLCs.  On July 7, 2010, the Circuit Court for Alachua County, Florida entered an "Order on Plaintiff's Verified Motion for Proceedings Supplementary to Judgment, For Impleader and Related Relief," which impleaded certain of Lower Tier LLCs and enjoined those LLCs from "directly or indirectly transferring or further encumbering" their assets. (Inervest Ex. 35).  The day prior to the scheduled Sheriff's sale, the Debtor paid Inervest $200,000 in exchange for Inervest's forbearance from collecting on the judgment for 60 days and cancelling

of the pending Sheriff's sale.  (Tr. 66).  The Debtor then filed its Chapter 11 petition within the 60-day forbearance period and on the 90th day following the recordation of Inervest's judgment lien certificate.

The Debtor scheduled its debt to Inervest as "disputed," even though it is uncontroverted that the appeal time on the Inervest judgment ran long before the Debtor filed this case.  On the petition date, Inervest was the only creditor in pursuit of a claim against the Debtor, was the only creditor having sued the Debtor, and was the Debtor's only judgment creditor.   (Inervest Ex. 2).  Furthermore, as of the date of the petition, all the other obligations of the Middle Tier and Lower Tier LLCs were current (excepting only a relatively minor arrearage as to Stratford Mills' mortgage). (Tr. 93, 109).

There are, in total, only three non-insider creditors of the Debtor:  Inervest, Wells Fargo, and SunTrust Bank. (Inervest Ex. 2).[1]  Inervest is the only creditor of these three whose claim is not secured by a mortgage on non-debtor property and is not guaranteed by the Debtor's insiders, subsidiaries and/or principals.

## IV.   Wells Fargo and SunTrust

Wells Fargo has two (2) claims against the Debtor.  The first arises from the Acquisition Loan, which is secured by a first mortgage on Lots Two, Three, and Four of the Biloxi property, and currently has a principal balance of $5,451,864.99.  (Inervest Ex. 13, Tr. 58).   Wells Fargo's second claim arises from Beau View's Construction Loan that has a current balance of $8.2 million.  (Tr. 58).  The Debtor is one of the guarantors on the Construction Loan, and thus, Wells Fargo's claim arises out of a potential deficiency.  This Wells Fargo claim arose after Inervest's claim, involving Beau View, which did not exist at the time of the Inervest loan.  As of the petition date, the Debtor

---

[1] The Debtor also listed on its Schedule F, a debt owed to Dell Graham for legal fees incurred in the amount of $1,322.10 for a consultation with that law firm on how to handle Inervest's claims.  (Doc. 18).  It is also unclear as to whether this debt has been paid or not.  (Tr. 74).

(together with Beau View) was current on both the Wells Fargo Acquisition Loan and the Construction Loan under the terms of a Fifth Forbearance Agreement.  (Inervest Ex. 15; Tr. 58-59).  Insiders, including Stefan Davis, the mother, Norita Davis, and Davis Heritage, Ltd, guaranteed both of the Wells Fargo loans.  (Inervest Ex. 15; Tr. 60).  Wells Fargo's two claims are further secured by a mortgage on 7,000 acres of real property owned by Davis Heritage, Ltd. in Alachua County, Florida. Furthermore, on or about September 10, 2010, another affiliate of the Debtor, Lexington Parke II of Gainesville, Ltd., agreed to give Wells Fargo a mortgage on 11,000 acres of land in Okaloosa County, Florida, known as the "Shoal River Ranch."  (Inervest Ex. 14; Tr. 64-65).

SunTrust Bank does not have a direct claim against the Debtor.  Rather, SunTrust's claim is based on the Debtor's guaranty of obligations of two of the Lower Tier LLCs, Baleen of Destin, LLC and Biscayne Bay of Miami, LLC ("Baleen" and "Biscayne," respectively).  Inervest (Ex. 24; Tr. 67).  The SunTrust loans are cross-collateralized and the balances due on those loans pre-petition were $1.5 million as to Baleen, and $2.5 million as to Biscayne. (Tr. 67).  Stefan Davis testified that the purchase price of the Biscayne property was $6 million and the value of the Baleen property is $1.5 million.  (Tr. 67-68; Inervest Ex. 10; 11).[2]  The SunTrust loans are guaranteed by insiders of the Debtor, including Stefan Davis, Norita Davis, EarthArt, Inc., and Davis Heritage, Ltd.  (Inervest Ex. 24; Tr. 68).  Furthermore, SunTrust holds, as additional security, certain Certificates of Deposit of Norita Davis and Money Market Accounts of Stefan Davis.  Similar to the Wells Fargo claims, the SunTrust loans were made after the Inervest loan arose and to entities that did not exist at the time of the Inervest loan.

---

[2] One of the motions before the Court for consideration at the December 8 hearing was the Debtor's motion to sell the Baleen property for $1.5 million, with all net proceeds of the sale to be paid to SunTrust Bank.  The Court authorized the Debtor to authorize Baleen to close on that sale, subject to the Florida state court's injunction against the sale of the Baleen property.  If the Baleen sale is closed, then SunTrust's claim will be reduced by approximately $1.3 million.

Days before the Petition was filed, SunTrust filed a mortgage foreclosure complaint against Baleen and Biscayne in Okaloosa County, Florida. It subsequently (post-petition) obtained defaults against all defendants in that action, including the Debtor, Baleen, Biscayne and the other guarantors. (Inervest Ex. 27; Tr. 156). The Debtor's principals did not retain counsel to defend the SunTrust action and allowed the SunTrust loans to go into default even though, as of July 21, 2010, the loans were current. (Inervest Ex. 24; 26; 27; Tr. 68-69).

Besides the claim of Dell Graham, the Debtor's only other scheduled unsecured creditors are insiders of the Debtor (*See* doc. 18; Tr. 74). As of the December 8 hearing, only one claim had been filed in this case, and it appears to be against one of the Middle Tier or Lower Tier LLCs, and not against this Debtor.

## V.    <u>Discussion</u>

Considering first the stay relief and dismissal issues, this Court and others have often recognized, when determining whether to grant stay relief for cause or dismiss a chapter 11 case, that a number of factors may evidence an "intent to abuse the judicial process and the purposes of the reorganization provisions." *In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393, 1394 (11th Cir. 1988); *see also In re Lorraine Guardian, Ltd.,* 104 B.R. 435, 437 (Bankr. N.D. Fla. 1989). Those factors include:

    a.   the debtor has only one asset, the property;

    b.   the debtor has few unsecured creditors whose claims are small in relation to the claims of the secured creditors;

    c.   the debtor has few employees;

    d.   the property is the subject of a foreclosure action as a result of arrearages of the debt;

    e.   the debtor's financial problems involve essentially a dispute between the debtor and the secured creditors which can be resolved in the pending state court action; and

      f.   the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights.

*In re Phoenix Picadilly, Ltd.,* 849 F.2d. at 1395.

Once a court finds that the above factors are present, "[t]he possibility of a successful reorganization cannot transform a bad faith filing into one undertaken in good faith." *Id.* All of the *Phoenix Picadilly* bad faith factors are present in this case, as are additional factors indicating bad faith. *See id.* The Debtor's financial problems involve a two-party dispute between it and Inervest that can be resolved in state court. Also, the timing of this petition shows an intent to delay or frustrate the legitimate collections efforts of Inervest – who is the only real direct creditor of the Debtor.

Bad faith in this case exceeds the *Phoenix Picadilly* factors in some significant respects. Unlike the traditional single asset case where a main creditor is stayed from collecting out of the debtor's only asset, this case involves a three-tier corporate structure created by the Debtor and its principals whereby Inervest is the only creditor that is adversely affected by the Automatic Stay. *See* 11 U.S.C. § 362(a). All other creditors of the Debtor with claims to the properties owned by the Lower Tier LLCs are free to pursue those claims through foreclosure on those real properties, thereby diminishing the value of the Debtor's only asset (membership in the Middle Tier LLCs), beyond the control of Inervest. This fact is illustrated by SunTrust's pursuit of its post-petition mortgage foreclosure litigation against the Baleen and Biscayne properties, which has been unopposed by the Debtor and its principals. Similarly, Stefan Davis' testimony states that in spite of the bankruptcy, and the way the enterprise has historically been managed, all of the Lower Tier LLCs are doing business as usual, renting units, offering units for sale, selling property, signing contracts for sale, and paying their bills. After a history of treating all the entities as a single corporate enterprise, the

Debtor now takes the position that it lacks control of its wholly-owned subsidiaries and only it, the Debtor, is subject to the rules and constraints of Chapter 11.

In reviewing Chapter 11 cases alleged to have been filed in bad faith, courts may look to all of the evidence and the totality of the circumstances to determine what is really happening, and the true intent and purpose behind the filing. *See id.* at 1394-95.  Here, the true intent and effect of this case and the Debtor's Plan are plain: the Debtor's insiders seek to donate assets subject to Inervest's judgment lien to SunTrust and Wells Fargo in order to shield their own assets and money from those creditors.  This scheme, memorialized in the Debtor's Chapter 11 Plan, amounts to a kind of reverse marshaling.  The Plan takes the only assets available to Inervest (and subject to its levy), property owned not by the Debtor but by the Lower Tier LLCs, and shifts that property to SunTrust and Wells Fargo, creditors with claims secured by other assets owned by the insiders.  This Plan reduces the amount that Inervest may collect and simultaneously reduces the guarantors'/insiders' liability to SunTrust and Wells Fargo.

Other indicia of good versus bad faith have been found to include the Debtor's honesty and forthrightness with the Court and the creditors.  In this case, the Debtor has not been honest or forthright.  The Debtor's Schedules, Statement of Financial Affairs and other pleadings are rife with errors and inconsistencies:

    a.   Inervest's claim is scheduled as "disputed," even though the time to appeal Inervest's judgment has expired, so there can no longer be any legitimate legal dispute about Inervest's claim.

    b.   Inervest's mortgage on the vacant parcel owned by the Debtor is not scheduled.

    c.   The real estate tax claim of the Harrison County tax collector is listed as unsecured on Schedule E, but in fact it is a claim secured by a first priority lien on the Mississippi real property.

13

d.  The only unsecured non-insider claim against the Debtor (aside from claims of SunTrust Bank and Wells Fargo, discussed below) is scheduled for $1,322.10 – and apparently is for prepetition legal services related to this case which were not properly disclosed as such.

e.  Responding to the question of whether there are any co-debtors liable on any of the scheduled debt, the Debtor checked the box that says, "Debtor has no co-debtors."  This is simply not true.  Stefan Davis' testimony and the documents in evidence show that the SunTrust claim is secured by property owned by two non-debtors and the Wells Fargo claim is secured by over 18,000 acres of real proper-ty owned by third party debtor affiliates.  Both the SunTrust and Wells Fargo claims are guaranteed by several persons and entities affiliated with the Debtor.

f.  In answer to question 18b of the Statement of Financial Affairs, the Debtor stated that none of the LLCs listed are single asset real estate entities.  This is not true.  Stefan Davis admitted at the December 8 hearing that all of the LLCs are single asset entities.

g.  The Debtor reports $0.00 of income from 2008-10 in Question 1 of the SOFA.  The Debtor's bank account records admitted into evidence show that millions of dollars flowed into, and out of, its bank accounts from 2007 through the filing of this petition.

h.  Stefan Davis, the Debtor's Managing Member and a guarantor of the Wells Fargo and SunTrust debts, testified under oath at the § 341 meeting that the Debtor did not have any sales of property pending.  The evidence shows that statement was untrue.  Attached to the Debtor's *Emergency Motion to Sell Property* is a contract

to sell the Baleen property that Mr. Davis signed in August of 2010, more than three months prior to his giving this testimony.

i.  The Debtor's schedules disclose no information about the property owned by the Lower Tier LLCs, or those entities' income and expenses.  Similarly, the Debtor has resisted producing information about the Lower Tier entities, initially objecting that the Debtor lacked "possession, custody, and control" of information related to the Lower Tier entities.  The Debtor has failed to respond to, or has objected to, all of Inervest's interrogatory requests and requests for admissions related to the Lower Tier entities and their assets.  Nonetheless, the Debtor's proposed chapter 11 Plan is founded upon the very properties that the Debtor has not scheduled, and about which, the Debtor has refused to answer questions or readily produce any information.

j.  The only asset of value (the Middle Tier LLCs) is scheduled at $718,572.55, notwithstanding that two of these LLCs own real property free and clear of liens and encumbrances (other than real estate taxes), and that these two properties alone are worth, according to Stefan Davis, $5 million and $2.5 million,  respectively. (Sch. B).

k.  In response to Question 23 on the SOFA, the Debtor stated that it did not make any transfers to insiders during the last two years.  However, the Debtor's bank statements and canceled checks plainly show any number of transfers to insiders during the period of December 2007 through August 2010, when transfers and income abruptly stopped just prior to the Debtor filing this case.[3]

---

[3] Stefan Davis testified that none of the Lower Tier LLCs had their own bank accounts until just prior to filing this case for the Debtor, and after they had met with the Debtor's bankruptcy counsel for the first time.

This case features all of the *Phoenix Picadilly* factors, plus one additional significant factor: this Debtor does not own anything that it can reorganize. The Debtor owns one parcel of vacant land in Mississippi that is fully encumbered and the only other § 541 property of this Estate is the Debtor's ownership interests in the Middle Tier LLCs. The only assets of the Middle Tier LLCs, as discussed, are the membership interests in the Lower Tier LLCs which, in turn, own pieces of real property that are not § 541 property of this estate. *See In re Brittain,* 435 B.R. 318 (Bankr. D.S.C. 2010).

In this case, the Debtor's insiders allege that the difficult economy caused the filing of this Chapter 11 case. This assertion is difficult to believe. The truth is that the case was filed to stop Inervest from levying on the Middle Tier LLCs. This Debtor and its insider/guarantors have historically ignored Inervest until Inervest levied on the Debtor's interests in the Middle Tier LLCs. The levy and the timing of this case are significant due to a recent ruling by the Supreme Court of Florida. On June 24, 2010 the Florida Supreme Court held that a judgment creditor is entitled to an order requiring a judgment debtor to surrender all right, title, and interest in the debtor's single-member LLC. *Olmstead v. F.T.C.,* 44 So.3d 76 (Fla. 2010) (responding to a certified question from the Eleventh Circuit Court of Appeals, *F.T.C. v. Olmstead*, 528 F.3d 1310 (11th Cir. 2008)). Before *Olmstead,* if a Florida judgment creditor levied on a debtor's ownership in a single-member LLC, the most the judgment creditor could get was a statutory charging order, which only entitled the judgment creditor to the judgment debtor's "rights to profits and distributions from the business entity in which the debtor has an ownership interest." *Olmstead v. F.T.C.,* 44 So.3d at 79. In the instant case, that result would not have threatened the Debtor, because the Debtor did not receive any "profits or distributions" from the Middle Tier, single-member LLCs. Pursuant to the holding of *Olmstead*, after June 24, 2010, Inervest became enti-

16

tled to cause the Debtor to surrender its "right, title and interest" in, and to, all of the Middle Tier LLCs. The Debtor would have lost control of the subsidiaries, and subsequently all the real property owned by the subsidiaries. In order to prevent that outcome, the Debtor filed the instant case.

This Court has also dismissed other Chapter 11 cases as bad faith filings, including one in which the debtor filed its plan the day prior to the dismissal hearing in an attempt to show its good faith in attempting to reorganize. *In re Lorraine Guardian, LTD,* 104 B.R. 435 (Bankr. N.D. Fla. 1989). In *Lorraine Guardian,* as here, the debtor had no ongoing business, no employees, one asset and no realistic prospect for reorganization, and in that case¸ this Court found that even if the debtor's plan could proceed to confirmation, confirmation would be impossible over the vote of the objecting creditor. *Id.* at 438. In the instant action, even though the Debtor filed its Plan just prior to the hearing, as the Eleventh Circuit Court stated in *Phoenix Picadilly,* "the possibility of a successful reorganization cannot transform a bad faith filing into one undertaken in good faith." *See Phoenix Picadilly,* 849 F.2d at 1395.

Other courts in Florida have dismissed cases on facts similar to this case. For instance, in *Singer Furniture Acquisition Corp. v. SSMC Inc.,* 254 B.R. 46 (M.D. Fla. 2000), the debtor appealed the bankruptcy court's dismissal of a chapter 11 case as a bad faith filing, and the District Court upheld the dismissal. *Singer* resembles the instant case. The debtor was a holding company not engaged in any business and had no employees. In *Singer,* as in this case, the debtor's financial problems and legal disputes were only with the creditor who moved for dismissal, and the debtor filed on the eve of a state trial in Virginia. The District Court in *Singer* stated that "courts have recognized factors which show an 'intent to abuse the judicial process and the purposes of the reorganization provisions' [when] the petition was filed strictly to circumvent pending litigation...." *Singer Furniture,* 254 B.R. at 52 (citing *In re Dixie Broad. Inc.,* 871 F.2d 1023,

1026-27 (11th Cir. 1989)).  *Singer* also resembles the instant case because, as the District Court there stated, "there is no real possibility of reorganization because Singer, by its own documents, had nothing to reorganize.  Singer reported no taxes, no accounts receivable, no accounts, no inventory, no bank account, no officer's compensation and no insurance in place."  *Id.*

Here, the Debtor filed its chapter 11 Plan on the eve of the December 8 hearing, which is a strategy commonly used in single-asset chapter 11 cases where debtors attempt to defuse the bad faith issues by filing a plan in an effort to show that they are proceeding in good faith.  *See In re Lorraine Guardian*, 104 B.R. at 437.  In this case, although the Court may laud the Debtor's efforts and the competence of Debtor's counsel, the plan is too little, too late and cannot overcome the other issues that these facts present. A case filed in bad faith cannot be cured by a good faith effort to propose a plan of reorganization.  *See Phoenix Picadilly*, 849 F.2d at 1394.

The Debtor here is merely a shell having no business to reorganize.  The Debtor owns other shells, that themselves own yet other single-purpose entities, which, when structured like this, constitute "bankruptcy remote entities" in the classic sense of that term.[4]  "Bankruptcy remote entities" are called that for a reason:  they and their assets are deliberately remote and sheltered from the effects of bankruptcy by their owners and/or principals.  Here, the Debtor's principals elected that the assets (the real property) would be owned by the Lower Tier LLCs in a three-tier corporate structure.  Although Stefan Davis offered no explanation for doing so, it is apparent that the purpose of the three-tier structure was to protect the underlying assets from bankruptcy and claims of creditors.  Their efforts have created the result that the Lower Tier LLCs, and their real property, are not § 541 property of this estate, and thus, this Court lacks jurisdiction over them.  Because of the Debtor's three-tier corporate structure, the automatic stay has no effect on

---

[4] A "bankruptcy remote entity" can be defined as "an entity, formed concurrently with, or immediately prior to, the closing of a financing transaction, one purpose of which is to isolate the financial assets from the potential bankruptcy of the original entity…" David B. Stratton, *Special Purpose Entities and Authority to File Bankruptcy*, 23-Mar Am. Bankr. Inst. J. 36 (March 2004).

the Lower Tier LLCs or their creditors, leaving the real property assets that provide the only possible value to the Debtor at risk.

Notwithstanding that the underlying assets are not subject to this Court's jurisdiction, and even though the Debtor has no income, assets, employees, business, or non-insider unsecured creditors, the Debtor asks this Court to allow the Debtor to attempt to confirm its chapter 11 Plan filed on the eve of the December 8 hearing. In order to confirm a chapter 11 plan, a debtor must prove that, among other things, the plan is in the best interests of the creditors, is fair and equitable, and is not filed for any improper purpose. 11 U.S.C. § 1129(a).

The Debtor's Plan cannot meet these requirements. The Plan does not appear to be in the best interests of the Debtor's creditors. The only creditor in this case with an undisputed, liquidated non-insider claim is Inervest. The only other non-insider claims are unliquidated and contingent claims of SunTrust Bank and Wells Fargo. When those claims are analyzed in their entirety, it is clear that those claims are secured by assets, including property of guarantors other than this Debtor, of a value sufficient to render their claims fully secured.

SunTrust's claims are based on the Debtor's guarantees of two loans: one that will be substantially paid upon closing of the sale of the Baleen property (Doc. 132), and the other having a balance of $2.5 million secured by a mortgage on a one-acre parcel on Biscayne Bay in Miami, Florida, for which the purchase price was $6 million. It is possible that even considering the depressed market for real estate, SunTrust is fully secured or oversecured. Thus, SunTrust may have no unsecured deficiency claim against this Debtor on its guaranty. Even if it does, SunTrust has recourse as to several of the Davis family members and affiliates as guarantors. These guarantors each have significant assets with which to pay any deficiency claim of SunTrust, including certificates of deposit that SunTrust is currently holding as additional collateral.

19

Wells Fargo holds two secured loans that might give rise to unsecured deficiencies: one the $5.5 million acquisition loan and a second $8.2 million remaining balance on the Construction Loan. The Debtor was current on these loans as of the petition date, and the construction loan continues to be reduced by the sale of luxury condominium units by Beau View. As with the SunTrust claim, Wells Fargo's potential unsecured claim against this Debtor is contingent and unliquidated, and may never arise. An appraisal of the 39 Beau View condominium units that remained unsold as of October 2009 states a retail market value for those units of $20 million.[5] Stefan Davis testified that sales of these units and the prices obtained have recently been improving to its best sales to date. (Tr. 66). The $5.5 million loan is secured by a first mortgage, ahead of Inervest, on the vacant Beau View land owned by the Debtor that was appraised in October of 2009 "as is, vacant" for $2.6 million. About 15 days prior to filing this Chapter 11 petition, the Debtor and its principals agreed to further secure the $5.5 million loan with a mortgage on 11,000 acres of real property known as the Shoal River Ranch that is owned by a guarantor of this loan.[6] Additionally, both Wells Fargo loans are guaranteed by Stefan Davis, Norita Davis and Davis Heritage, Ltd., all of whom appear to have more than sufficient assets with which to pay any deficiency that Wells Fargo may eventually have after the sale of the Beau View units.[7]

For these reasons, the Plan cannot demonstrate that it is in the best interest of creditors nor as to the only creditor of the Debtor with a non-contingent, liquidated claim--Inervest. At a minimum, substantial additional litigation will be required before it can be determined whether, and

---

[5] The Debtor listed Wells Fargo's claim at $120,102.25 but the plan gives Wells Fargo an unsecured claim of $3,000,000. There is no record evidence supporting such an amount. The only evidence before this Court shows that Wells Fargo's claims are fully secured by mortgages on the Beau View condominiums, the vacant Beau View lots and other properties.

[6] Although there was no evidence of the exact value of this 11,000 acres, Wells Fargo's mortgage will be a second or third mortgage behind a mortgage to Farm Credit of West Florida in the amount of $3.679 million on which the payments are current. Even at $3,000 per acre, there would be $30 million in equity available to satisfy Wells Fargo's potential deficiency claim. (Inervest Ex. 13,14).

[7] Inervest Ex. 38 shows several parcels of real property owned by Davis Heritage, Ltd. in Alachua County, alone.

to what extent, Wells Fargo or SunTrust have any unsecured claims in this case. This litigation can fairly be expected to be expensive and time consuming. These costs and the delay will further erode any potential recovery by Inervest.  In the meantime, Inervest would remain stayed from any attempt to collect against the Debtor, would receive no payments from the Debtor, and by the terms of the Plan as filed, Inervest will have no right to challenge the stated deficiency claims of Wells Fargo and SunTrust.  Under these facts, the Debtor cannot prove that its plan is in the best interests of its creditors.

Just as the Debtor cannot prove that its plan is in the best interest of its creditors, the Debtor cannot reasonably prove that its plan is fair or equitable as required by 11 U.S.C. § 1129(b). The Plan classifies Inervest's claim along with potential deficiency claims of Wells Fargo and Sun-Trust, and proposes to pay those claims on a pro-rata basis out of the liquidation of certain properties that are currently not available to either Wells Fargo or SunTrust.  Because the Wells Fargo and SunTrust claims are secured by other assets and guaranteed by a variety of individuals, affiliated entities, and properties, and because Inervest currently holds a claim as to the properties proposed to be contributed, the classification and treatment of Wells Fargo's and SunTrust's claims in the same class as Inervest is not fair nor is it equitable.

The Debtor's Plan has not been proposed in good faith as is required by 11 U.S.C. § 1129(a)(3), because it is not intended for the benefit of the Debtor or its creditors.  The Debtor's Plan is for the sole and exclusive benefit of its insiders.  Clearly Inervest does not benefit from the Plan, as it is required to sacrifice its levied property to the other two creditors. As to Wells Fargo, absent the Plan it would continue to be paid from the sales of the Beau View condos, the Beau View vacant land, and by the guarantors, just as it has been before and after this case was filed. Therefore, the Plan offers no benefit to Wells Fargo except as an additional recourse, which Wells Fargo does not need in order to be made whole. As to SunTrust, absent a Plan it

will continue either being paid from the sales of properties, by the guarantors, or will continue its foreclosure on the property securing its claim.  Therefore, the Plan offers no benefit to SunTrust except as an additional recourse, which SunTrust does not need in order to be made whole.

The only other creditors of this Debtor are the insiders, and they will be the only ones who will benefit by this case or confirmation of a plan, because their liability as guarantors to Wells Fargo and SunTrust will be significantly reduced to the extent that property subject to Inervest's levy will be contributed to Wells Fargo and SunTrust.

Inervest is the only creditor having no possible avenue to be made whole through the Debtor's proposed Plan.  If this case is dismissed, Inervest can continue its levy on this Debtor's main assets, membership interests in the Middle Tier LLCs, and to the extent that defenses exist, the Debtor can continue – in state court – to defend against Inervest's collection efforts.

The goal of the Debtor's Plan is obvious: to use as many of the non-insider owned assets as possible to satisfy as many of the insider-guaranteed debts as possible, in order to protect the insiders' assets from the claims of the only two creditors with recourse as to them.  At the same time, the Plan curtails the recovery of Inervest, continuing the conduct that created the need to file this case (i.e. not paying non-recourse creditor Inervest).  Essentially, the Plan is designed to utilize bankruptcy law to re-arrange the priorities of the existing three secured creditors in order to benefit the Debtor's insiders/guarantors.  This is the opposite of the intended purpose for Chapter 11 relief and is not good faith. Chapter 11 was not designed for the purpose of protecting assets and interests of non-debtor parties under the guise of a legitimate plan of reorganization.

In opposition to Inervest's motions to dismiss, to abstain or for stay relief, Wells Fargo argues that Inervest signed a subordination agreement and therefore should not be paid any money

ahead of Wells Fargo.  This argument is not relevant to the issues at bar because it is an inter-creditor dispute and is an issue that can properly be determined by the state courts.[8]

## VI.    Conclusion

At the heart of this case is the Debtor's argument that it would be inequitable to dismiss this case and permit Inervest to cut off an avenue of recovery by Wells Fargo and SunTrust by seizing the membership interests of the Debtor in the Middle Tier LLCs.  I reject this contention.  Wells Fargo's and SunTrust's claims remain secured to an extent not yet determined.  Wells Fargo's mortgage on the Debtor's only real property is senior to that of Inervest and its mortgage on the remaining condominium units at Beau View would not be impacted by an Inervest seizure of the Debtor's interests.  Likewise, SunTrust's mortgages will not be affected and should be substantially reduced by the sale of the Baleen property.

Even if, after the sale or liquidation of the mortgaged properties, Wells Fargo or SunTrust are not paid in full, they still have various avenues of recovery through the various guarantors of their loans and their extensive assets.  On the other hand, Inervest is limited to only one source of recovery, that being whatever value there may be in the assets of the Lower Tier LLCs after payment of the Wells Fargo and SunTrust mortgages.  To attempt to limit Inervest's ultimate recovery on its judgment to a share of this value based as yet to be determined deficiency claims of

---

[8]The Subordination Agreement entered into evidence shows that Inervest subordinated to loans made to this Debtor, which does not include the construction loan because that loan was made to Beau View of Biloxi, LLC.  The Subordination Agreement defines the "Borrower" as "Davis Heritage GP Holdings, LLC" and defines "Senior Liabilities" as "all obligations or indebtedness now or hereafter owing by the *Borrower* to the Bank."  Coastal Land, now Inervest, subordinated to the "Senior Liabilities" of Davis Heritage GP Holdings, LLC and the construction loan was made to Beau View of Biloxi, LLC, so it is possible that the Subordination Agreement may not apply to the construction loan at all.  In any event, as this Court pointed out at the December 8 hearing, and as counsel for the Debtor conceded, if Inervest completes its levy on the Middle Tier LLCs, Inervest may take ownership of the properties owned by the bankruptcy remote LLCs, but only *subject to* the mortgages of Wells Fargo.  (Wells Fargo Exhibit 1; Inervest Ex. 21).

other creditors which are almost certain to be able to recover full payment of those claims through the guarantors is inequitable and constitutes bad faith.

For the foregoing reasons, Inervest's Motion to Dismiss is granted thus rendering Inervest's Motion for Relief from Stay and Motion for Abstention moot.  Accordingly, it is hereby

ORDERED and ADJUDGED that Inervest's Motion to Dismiss (Doc. 39) is GRANTED and this case shall be dismissed.

It is FURTHER ORDERED and ADJUDGED that Inervest's Motion for Relief from Stay (Doc. 23) and Motion for Abstention Under § 305 (Doc. 45) are DENIED as MOOT.

DONE and ORDERED in Tallahassee, Florida this  3rd  day of January, 2011.


_____
LEWIS M. KILLIAN, JR.
United States Bankruptcy Judge

cc:  all parties in interest

24